# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| JAMES G. CORRIVEAU,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF ANOKA, MINNESOTA, and<br>JPMORGAN CHASE BANK, N.A.,<br>*individually and as successor in interest<br>to Washington Mutual Bank*,<br><br>Defendants. | Civil No. 10-3933 (JRT/FLN)<br><br>**MEMORANDUM OPINION AND<br>ORDER DENYING PLAINTIFF'S<br>MOTION FOR A TEMPORARY<br>RESTRAINING ORDER** |

Christopher P. Parrington and Ryan P. Myers, **SKJOLD BARTHEL, PA**, 222 South 9th Street, Suite 3220, Minneapolis, MN 55402, and Christine M. Swanson and Patrick John Kelly, **KELLY & LEMMONS, PA**, 7300 Hudson Boulevard. Suite 200, St. Paul, MN 55128, for plaintiff.

Jessica E. Schwie and Pierre N. Regnier, **JARDINE LOGAN & O'BRIEN PLLP**, 8519 Eagle Point Boulevard. Suite 100, Lake Elmo, MN 55042-2179, for defendant City of Anoka.

Steven C. Opheim, Joseph J. Dudley, Jr., and Mark K. Thompson, **DUDLEY & SMITH, PA**, 101 East 5th Street, Suite 2602, St. Paul, MN 55101, for defendant JPMorgan Chase Bank.

Plaintiff James Corriveau ("Corriveau"), a landlord in Anoka County, Minnesota, filed suit against the City of Anoka ("the City") for, among other claims, tortious interference with his business relationships, negligence, fraud and defamation, relating to the City's involvement in several residential buildings owned by Corriveau. He also sued JPMorgan Chase Bank ("JPMorgan"), the holder of mortgages on two of his properties,

for conspiring with the City. Before the Court is Corriveau's motion for a temporary restraining order (TRO). For the reasons stated below, the Court denies the motion.

## BACKGROUND

Corriveau is a businessperson who owns numerous residential and commercial properties in Anoka County. (Compl. ¶¶ 6, 15, Docket No. 1.) As of 2005, thirteen of Corriveau's twenty one properties were within Anoka city limits. (*Id.* ¶ 15.) The primary subject of this litigation is an apartment complex ("Greenhaven") Corriveau purchased in or about October 2005. Corriveau and his then-wife funded the purchase of Greenhaven and another series of buildings ("Sixth Avenue") with two loans and mortgages through Washington Mutual Bank, to which JPMorgan is a successor in interest. (*Id.* ¶¶ 8-9.)

Corriveau managed Greenhaven without incident until December 4, 2009, when the electric motor that drove the lift station in the building's pump house failed. (*Id.* ¶¶ 28-29.) Tenants were consequently unable to access water and sewer services for three days. (*Id.* ¶ 33.) After a restoration of services on December 7, the lift station failed again on December 10 because of a faulty pneumatic pump, once more leaving Greenhaven tenants without water and sewer services. (*Id.* ¶ 37.) Corriveau replaced the pneumatic pump on December 12. (*Id.* ¶ 42.) However, the water pressure in the building was reduced to half its capacity because water froze in the pipes during the cessation of water services. (*Id.* ¶ 43.) On December 14, Corriveau located and thawed the frozen pipe section and restored full water pressure to Greenhaven. (*Id.* ¶ 45.) On December 20, Green haven's water and sewage system again encountered problems when

a check valve on the lift station failed, causing water to back up into the utility room, two units adjacent to the utility room, and portions of the lower level hallway. (*Id.* ¶ 46.)

Corriveau alleges he did everything in his power to address these issues, and offered his tenants a discount on their rent for the month of January 2010. (*Id.* ¶ 41.) Only one tenant occupied a lower level unit, and Corriveau claims that he arranged for this individual to relocate to a vacant unit on the upper floor. (*Id.* ¶ 49.)

On December 21, 2009, Ray Fuglie, the Property Maintenance Coordinator for the City, visited Greenhaven. (Fuglie Aff. ¶ 5, Docket No. 23.) According to Fuglie, Greenhaven residents contacted him throughout the month of December to report the water service shut offs. (*Id.* ¶ 2-3.) When Fuglie visited the property on December 21, he observed wet carpet in the lower level common area, approximately one fourth of an inch of standing water in the mechanical room, solid waste in the common area and mechanical room, and an offensive odor consistent with a sewage back-up. (*Id.* ¶ 5.) When Fuglie returned the next day, he concluded that the lift station was operational and that the open areas and mechanical room had been "sufficiently cleaned for the time being." (*Id.* ¶ 6.) Fuglie advised Corriveau to continue his cleaning efforts and stated his intent to return for another inspection on December 28. (*Id.*)

On December 23, 2009, however, Fuglie received another report that "there was still a problem" at the apartment complex. (*Id.* ¶ 7.) Fuglie returned to the property, and concluded that wastewater from the lift station was discharging into the parking lot, the street, and the storm sewer system through a hose that had been installed in the lift station. (*Id.*) In addition, he observed that the lift station was "making a loud banging

noise." (*Id.*) Fuglie also learned that the lower level tenant had not been offered the opportunity to move to another unit as Corriveau had indicated. (*Id.*) Fuglie received varying accounts from Corriveau and the Greenhaven tenants regarding the longevity and extent of water and sewage problems at the property. (*Id.*) Fuglie's account is corroborated by Roger Wiley, the City's Building Official who also inspected the lower level of Greenhaven on December 23. (Wiley Aff. ¶ 2, Docket No. 21.) Like Fuglie, Wiley asserts that he observed a malfunctioning lift station, wet floors, and human waste "in bathtubs, stools, and on walls in apartments." (*Id.*)

The City posted a "DO NOT OCCUPY" notice at the property at or about 5:00 p.m. on December 23, even though Corriveau asserts he had nearly completed the cleanup of the property. (Compl. ¶ 54, Docket No. 1.) According to Wiley, the notice applied only to the lower level because Corriveau and Greenhaven's tenants complained that they would struggle to find other accommodations so close to the Christmas holiday. (Wiley Aff. ¶ 5, Docket No. 21.)[1] Corriveau was given until 7:00 a.m. on December 24, 2009, to clean the building and repair the lift station. (*Id.*)

According to Corriveau, the City's actions were motivated by a personal grudge held against him by an Anoka City Councilmember, Mark Freeburg. In December 2001, Freeburg's son was a tenant in Sixth Avenue when Corriveau purchased the property. (Compl. ¶¶ 16-18, Docket No. 1.) When Freeburg's son was delinquent in his rental payments, Corriveau initiated eviction proceedings and obtained a judgment against him

---

[1] The City issued notices of rental license revocation ("revocation notices") for Greenhaven's lower level on December 28 and 29, 2009. (Exs. H, I, Docket No. 1.)

and Freeburg's wife, who had co-signed the lease. (*Id.* ¶¶ 19, 23.) Ultimately Corriveau agreed to a payment arrangement with the tenant, Freeburg, and Freeburg's wife. (*Id.* ¶ 24.) In addition to ill will resulting from the eviction proceeding, in 2004, Corriveau supported Freeburg's political rival in a mayoral race. (*Id.* ¶ 25.) In 2005, Freeburg publicly disagreed with Corriveau's position on a local rental reporting ordinance. (*Id.* ¶ 26.)

Corriveau alleges that Freeburg contacted the City's Public Works Department on December 23, 2009 and demanded that they return to Greenhaven without evidence that the situation had worsened since the inspection performed by Fuglie. (*Id.* ¶ 53.) Freeburg accompanied Fuglie, Wiley, and other City officials and employees to Greenhaven when the City posted the condemnation notice later that day. (*Id.* ¶ 56.) According to Corriveau, Councilmember Freeburg also provoked a physical and verbal confrontation with Corriveau at the property that evening and subsequently defamed Corriveau, misrepresenting the problems at Greenhaven in media outlets and elsewhere. (*Id.* ¶¶ 57-69.)[2]

On December 24, 2009, Wiley returned to Greenhaven and determined that no cleaning corrections had been made and that the lift station remained inoperable despite Corriveau's protestations that it was functioning. (Wiley Aff. ¶ 6, Docket No. 21.) The City hired companies to install an operational pump in the lift station and to clean

---

[2] Corriveau also alleges that Fuglie told him that Freeburg had forced him to send the revocation notices, and that the City's actions were the result of animus between Freeburg and Corriveau. (*Id.* ¶ 82.)

Greenhaven "to the extent necessary to make it safely habitable on the upper levels of the building." (*Id.* ¶ 7.) The City's work was completed by December 30. (*Id.* ¶ 8.) Corriveau says he informed Wiley that he had already hired professional remediation specialists. (Compl. ¶ 72, Docket No. 1.) The City, Corriveau alleges, entered Greenhaven without his authorization, broke down several doors to units that had no damage resulting from the back up, and removed walls and carpet "in a wanton and incomplete manner . . . ." (*Id.* ¶ 73.) Moreover, the City did not obtain a permit to perform the work until December 30, 2009, after the work was completed. (*Id.* ¶ 76.)

Greenhaven's lift station had two pumps at the time it failed in December 2009. (Wiley Aff. ¶ 9, Docket No. 21.) Wiley determined that neither pump was in an adequate state to service the property, but the City installed only one pump to "meet the need for immediate corrections." (*Id.*) According to Wiley, he later advised Corriveau that he was required to install a backup pump to prevent a failure similar to those in December 2009. (*Id.*)

The City assessed Corriveau and the property $41,108.43 for the parts and labor supplied for its remediation efforts. (Compl. ¶ 83, Docket No. 1.) According to Corriveau, the City's actions caused several tenants to vacate Greenhaven without notifying him. (Compl. ¶ 85, Docket No. 1.) Corriveau further alleges that the City purchased and installed an inappropriately small pump which has failed nearly thirty times in the past eight months, forcing him to incur further expenses. (*Id.* ¶¶ 77-78.) Moreover, Corriveau asserts that the City and JPMorgan have subsequently conspired to intimidate and threaten Corriveau's tenants. (*Id.* ¶ 101.) For example, Corriveau points

to the posting of notices of utility shut off at four of his properties in May 2010 by the City, two of which were rescinded the same day. (*See* Exs. K, L, M, N, Docket No. 1.) The City, Corriveau alleges, is now planning to revoke his license to rent property. (*See id.* Ex. Q.)

According to the City, lift station problems at Greenhaven have continued. Despite numerous written notices from the City requiring Corriveau to install a backup pump in the lift station, he has not done so, leaving the tenants vulnerable to a sewage back-up similar to the one that occurred in December 2009. (*See* Exs. J, L, Docket No. 22.) In response to Corriveau's failure to install a backup pump, the City has **suspended**, but not revoked, Corriveau's rental license, pending proof of compliance with this requirement. Moreover, the City has posted utility shut off notices at Greenhaven at least four times since January 2010 due to Corriveau's failure to pay for utility services. (Peterson Aff., Docket No. 25.)

The City asserts that Greenhaven is beset with additional issues including Corriveau's delinquent water and utilities bill, and a boiler that should not have been utilized until certain repairs were completed. Within the last week, the City ascertained that CenterPoint Energy locked off gas services to the furnace at Greenhaven due to Corriveau's delinquency in making payments. At oral argument, Corriveau's counsel conceded that at least one account with CenterPoint connected to the property is in arrears. A tenant sued Corriveau in state court for failing to provide gas for heating. *See Walberg v. Corriveau*, 02-CR-10-7695 (Minn. Dist. Ct. Nov. 3, 2010) ("*Walberg* Order"). **On November 3, 2010, the state court judge assigned Greenhaven to an**

**administrator** as part of that lawsuit. According to Corriveau, the City inappropriately involved itself in the lawsuit, demanding that CenterPoint turn off the gas without good cause and holding inappropriate ex parte discussions with the judge. At oral argument, the City proffered evidence including contemporaneous photographs of Greenhaven during its recent inspection to support its assertions regarding the boiler and gas services.

Corriveau alleges that as a result of the City's actions, he has experienced a precipitous loss in income, rendering him unable to pay the mortgages on several of his properties, including Greenhaven. According to JPMorgan, Corriveau defaulted on the loans for Greenhaven and Sixth Avenue **in March 2008**. (Ex. A, Docket No. 28.) Corriveau commenced a civil action against the bank in state court to enjoin foreclosure on the properties. After the bank prevailed on appeal, it reinitiated foreclosure by advertisement and was the highest bidder for both properties at the sheriff's sales on July 8, 2010. (Pliszka Aff. ¶¶ 12-13, Docket No. 28.)[3] On July 7, 2010, JPMorgan filed suit against Corriveau in state court, seeking the appointment of a receiver to manage Greenhaven and Sixth Avenue during Corriveau's redemption period, which expires in January 2011.[4] **The last date on which Corriveau made a payment on the loans was May 13, 2009**. (*Id.* Exs. C, D.)

Corriveau filed suit against both Anoka and JPMorgan on September 15, 2010. His claims against the City include tortious interference with business relationships and

---

[3] The bank assigned its interest in the properties to its holding company, HCP Properties, Inc. (*Id.* ¶ 14.)

[4] Corriveau has removed those cases to federal court.

contractual relations, fraud, negligent misrepresentation, and defamation, as well as federal constitutional due process and equal protection claims. The only claim against JPMorgan is civil conspiracy. According to Corriveau, JPMorgan conspired with Anoka beginning in December 2009 to "conceive[] and execute[] a plan to intimidate and threaten Corriveau's tenants[,]" inciting them to leave and enabling JPMorgan to foreclose on Greenhaven and Sixth Avenue. (Compl. ¶ 101, Docket No. 1.)

Before the Court is a Motion for Temporary Restraining Order filed by Corriveau the same day as his complaint. Among other relief, Corriveau requests that this Court enjoin the City from revoking his rental license and stay the redemption period pending the outcome of this litigation.

## ANALYSIS

### I. STANDARD OF REVIEW

Rule 65 of the Federal Rules of Civil Procedure governs the issuance of temporary retraining orders and preliminary injunctions. Because defendants have had an opportunity to respond and because Corriveau seeks injunctive relief extending until the conclusion of this lawsuit, the Court will consider his motion as one requesting a preliminary injunction under Rule 65(b) rather than a temporary restraining order under Rule 65(a). *See Jihad v. Fabian*, 680 F. Supp. 2d 1021, 1030 (D. Minn. 2010).

Assuming the Court **could** grant Corriveau the relief he seeks,[5] four factors must be considered to determine whether Corriveau is entitled to preliminary injunctive relief: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). "[T]he question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* No single factor is determinative. *Id.* "A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant[.]" *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citation omitted). The party seeking a preliminary injunction must prove **all** of the *Dataphase* factors. *Id.*

## II.     THE CITY

The Court begins with the "most important" *Dataphase* factor, the probability that Corriveau will succeed on the merits. *Windgate Software, L.L.C. v. Minn. Computers, Inc.*, 504 F. Supp. 2d 582, 587 (D. Minn. 2007). The Court finds it unlikely that Corriveau can prove any of his claims against the City.

---

[5] Corriveau asks the Court to enjoin the City from revoking his rental license and to compel the City to lift the suspension on his license so that he can continue to manage and receive rental income from Greenhaven. However, such an order would necessarily conflict with the state court judge's recent order appointing an administrator to the property. Because the Court concludes that Corriveau has not established he is entitled to relief, it is unnecessary to address various jurisdictional and absention issues that would arise if the Court concluded otherwise.

For example, to establish wrongful interference with contractual relations, Corriveau must prove that "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994) (citation omitted). There is no doubt that Corriveau had contracts, lease agreements, with Greenhaven tenants. In issuing and subsequently suspending his rental license, the City presumably knew of the leases. However, even assuming that Councilmember Freeburg harbors personal animus towards Corriveau, on the basis of the evidence currently before the Court, the City's actions in December 2009 and later appear justified and aimed at enforcing building codes and other public safety provisions.

Greenhaven experienced severe water and sewage problems in December 2009 after which the City received complaints. When Corriveau did not meet the City's deadline for remediation, the City hired companies to address the issues. Corriveau argues that the City's actions on December 23-30, 2009 (posting the "DO NOT OCCUPY" notice and conducting its own remediation efforts) constitute unwarranted interference with his relations with current and prospective tenants. According to Corriveau, Fuglie informed him on December 22 that Corriveau's remediation efforts were proceeding appropriately and that Fuglie did not plan to return to the property again until December 28, but then returned December 23 at Freeburg's insistence. Moreover, Corriveau argues, the City did not obtain a permit for its remediation work until December 30.

Citing the minutes of a January 4, 2010 City Council meeting, Corriveau alleges that Freeburg "contacted the Public Works Department on December 23, 20[09] and, without any evidence that the situation had worsened since the city inspection performed by Mr. Fuglie on December 21, 2010, **demanded** that they return to the Property to fix the 'deplorable' situation." (Compl. ¶ 53, Docket No. 1) (emphasis added). The meeting minutes do not support this allegation. Rather, the minutes reflect the City's Planning Director's statement that City staff was "still collecting information on times and dates" regarding the incident. (Ex. C, Docket No. 1.) In response to a tenant advocate at the meeting asking **why the City did not act sooner to address the sewage and water issues**, the Planning Director explained that "while [City] staff continued to work with the owner to allow time for him to repair the lift station, the building official finally had to post the building uninhabitable in order to make the repairs for [him]." (*Id.*) There is no indication in the minutes that Freeburg prompted, let alone demanded, the December 23 inspection; in addition, the description of the situation at Greenhaven as "deplorable" was by another Councilmember.

Fuglie's and Wiley's affidavits are contrary to Corriveau's allegation that Freeburg's animus motivated the City's escalation of its efforts. Fuglie agreed that he approved of Corriveau's cleaning efforts on December 22 and planned to return December 28. However, **he received another report about Greenhaven on December 23**. Accordingly, he returned to the property and concluded that wastewater from the lift station was discharging into the parking lot, the municipal street, and the storm sewer system. He also observed that the lift station was "making a loud banging

noise" and he learned that the lower level tenant had not been offered the opportunity to move to another unit as Corriveau had indicated. Roger Wiley made similar observations, noting human waste on walls. The City therefore decided to post a "NO OCCUPANCY" notice.[6] When Corriveau did not meet his deadline for remediation the next morning, on December 24, the City commenced its own cleaning efforts and installed a new pump. The urgency of the situation seems to have warranted these actions even in the absence of a permit and despite Freeburg's personal feelings. While Corriveau may ultimately prove otherwise, he has not met his burden of establishing a probability of success on the merits on any of his claims or allegations against the City based on the events of December 2009[7] sufficient to justify preliminary injunctive relief.

Similarly, based on a careful review of the record and arguments, the Court finds a low likelihood that Corriveau will prevail in his claims against the City based on its alleged "harassment," or continuing interference, since December 2009. "There is no

---

[6] As support for several of his claims including tortious interference with business relations and contractual relations and defamation, Corriveau alleges that the City informed his tenants on December 23 that Greenhaven was condemned through the "condemnation notice" but then "admitted" at the January 4, 2010 Council meeting that the building had not been condemned. The minutes reflect the Planning Director's statement that "the building was not condemned but posted for no occupancy because it could not be lived in until the necessary repairs were made to make it rehabitable." (Ex. C, Docket No. 1.) The "condemnation notice" to which Corriveau refers is the "DO NOT OCCUPY" notice the City agrees it posted. (*See id.*, Ex. D.) The Court finds it unnecessary to parse the distinction, if any, between condemnation and posting for no occupancy as the Planning Director's statement seems entirely consistent with the City's position, the affidavits, and other record evidence before the Court.

[7] For example, part of Corriveau's defamation claim is that the City allegedly falsely represented to his tenants that the building had been condemned in December 2009. The record before the Court supports the City's contention that it posted a no occupancy notice regarding the lower level of Greenhaven after it found human waste on the walls and other sewage issues. This action seems appropriate given the circumstances.

wrongful interference with a contract where one asserts in good faith a legally protected interest of his own . . . believ[ing] that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction." *Kjesbo*, 517 N.W.2d at 588 (citation omitted). The City is responsible for enforcing rental licensing ordinances and other laws, such as those dictating the maintenance of sewage systems, for the protection of the public. *See, e.g.*, Minn. Stat. § 326B.101 (building codes "establish reasonable safeguards for health, safety, welfare, comfort, and security of the residents of this state[.]").

The City has offered evidence that Corriveau failed to maintain a boiler compliant with state inspection standards, stay up to date in his bills for utilities, water, and gas, or install a backup pump to prevent events similar to those in December 2009. The allegedly harassing actions of the City – such as posting utility shut off notices, suspending Corriveau's rental license for failure to install a second pump, or asking Greenhaven tenants whether Corriveau has rented out space in violation of his rental license suspension – do not, at this point, seem to be inappropriate responses to Corriveau's delinquencies given its own obligations to enforce public health and safety laws. A state court judge recently placed the property into the control of an administrator due to the delinquency of Corriveau's CenterPoint account and consequential cessation of gas services for heat. The judge's order of November 3, 2010 references "two prior orders from this Court to remedy [the] gas issue." *Walberg* Order at 2.

Moreover, the second and fourth *Dataphase* factors – a comparison of the harm Corriveau will experience if his motion is not granted against the injury the City may

suffer if his motion is granted, and the public interest – also weigh heavily against preliminary injunctive relief. While the loss of control and income from Greenhaven will certainly cause Corriveau financial, and potentially reputational injury, **it is undisputed that**: (a) Greenhaven's lift station problems in December 2009 resulted in sporadic cessations of water services and a sewage back up; (b) the City has required Corriveau to install a second pump in the lift station since December 2009; (c) despite the City's demands **and the suspension of his rental license**, Corriveau still has not done so; (d) the lift station has continued to have problems since December 2009; and (e) Corriveau is required to have two pumps in Greenhaven. *See* Minn. R. 4715.2440 subp. 3 ("In all buildings, other than single- and two-family dwellings, should three or more water closets discharge into the sump, **duplicate pumping equipment shall be installed**." (emphasis added)). It is reasonable to infer that without a second pump Greenhaven's tenants are vulnerable to problems similar to those experienced in December 2009.

Prohibiting the City from entering Corriveau's property without his authority and from taking other steps, including revocation of his rental license, to enforce laws and rules aimed at protecting public safety would potentially jeopardize the safety and welfare of Greenhaven's tenants. In these circumstances, the Court declines to grant preliminary injunctive relief that would threaten the public interest. *See Stewart v. City of Red Wing*, 554 F. Supp. 2d 924, 933 (D. Minn. 2008) ("The implementation of a rental inspection ordinance designed to ensure safe and clean rental housing is surely in the public interest.").

Corriveau has arguably not even met the first *Dataphase* factor, the threat of imminent injury. At oral argument, the City's counsel stated that the City has no immediate plans to revoke Corriveau's rental license since the state court order appointing an administrator to manage the property has had the same effect as a revocation or continual suspension. While the possibility of the City "trespassing" on Greenhaven (property, the Court notes, currently owned by JPMorgan) or interacting with Greenhaven tenants – actions Corriveau seeks to enjoin – is imminent, the Court finds difficulty concluding that these interactions will result in "injury" to Corriveau because the City's actions appear to be remedial responses to Corriveau's own failures to fulfill his obligations as a landlord. *See Jihad*, 680 F. Supp. 2d at 1045 ("[S]ince we find that the likelihood that the Plaintiff will succeed on the merits of his claims does not weigh in favor of his request for a preliminary injunction, we also find that the Plaintiff has failed to establish any irreparable harm.").

In addition, "irreparable harm" is "that for which there is no adequate remedy at law in the form of damages." *Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 990 (D. Minn. 2006). Except for reputational damage, injury which the Court finds Corriveau will be unlikely to trace to the City's conduct, Corriveau's alleged harm – property destruction, the cost of repair work, and loss of income from lost tenants – is readily amenable to quantification.

In short, the Court concludes that Corriveau has not established his entitlement to the extraordinary remedy of preliminary injunctive relief against the City.

### III. JPMORGAN

Corriveau's basis for preliminary injunctive relief against JPMorgan is even more tenuous than his grounds for relief against the City. Corriveau requests that the Court suspend the redemption period[8] pending the outcome of this litigation despite the facts that (a) he has not made a mortgage payment since May 2009, (b) JPMorgan has already foreclosed upon Greenhaven and Sixth Avenue, and (c) Corriveau has not alleged any deficiencies in the underlying mortgage foreclosures.

The Court concludes that Corriveau has not shown that any *Dataphase* factor weighs in favor of granting preliminary injunctive relief against JPMorgan. Corriveau alleges a single cause of action against JPMorgan: conspiracy. It is highly improbable that Corriveau will succeed on the merits of this claim. As the Minnesota Supreme Court has explained, "[a]ccurately speaking, there is no such thing as a civil action for conspiracy." *Harding v. Ohio Cas. Ins. Co. of Hamilton, Ohio*, 41 N.W.2d 818, 825 (Minn. 1950) (citation and quotation marks omitted). "Rather, a civil conspiracy claim is merely a vehicle for asserting vicarious or joint and several liability." *Bloom v. Hennepin*

---

[8] It is unclear if Corriveau is also requesting that the Court stay JPMorgan's receivership actions, a request arguably made moot with regard to Greenhaven by the assignment of an administrator to that property. Corriveau refers to JPMorgan's actions against it as "pending foreclosures" in his brief and seemed to request that the Court enjoin JPMorgan's "foreclosure" at oral argument. In fact, the foreclosures and sales have been completed and Corriveau is a few months away from the expiration of his redemption period on January 10, 2011. Accordingly, the Court finds that the only preliminary relief the Court could conceivably grant is a stay on Corriveau's redemption period, which it will not order for the reasons stated herein.

*County*, 783 F. Supp. 418, 446 (D. Minn. 1992). Corriveau's complaint, however, does not allege any specific intentional tort against JPMorgan.

Corriveau views his allegation that the City appeared at JPMorgan's inspection of Greenhaven and Sixth Avenue undertaken on September 2, 2010, pursuant to its receivership actions as "the most compelling evidence" of JPMorgan's conspiracy. Even if Corriveau's complaint were construed as alleging tortious behavior by JPMorgan, the Court does not view this allegation as indicative of a conspiracy, which requires proof "that defendants' acts were motivated by community of purpose or a common understanding to commit wrong." *Id.* The bank has been attempting to foreclose on Greenhaven and Sixth Avenue **since April 2008, nearly twenty months before the alleged conspiracy commenced**. (*See, e.g.*, Ex. A, Docket No. 28.) JPMorgan's consistency in attempting to foreclose upon properties with unpaid mortgages (and doing so in a manner unchallenged by Corriveau) severely undermines any tort claims against it, although none are alleged in Corriveau's complaint.

In these circumstances, any injury suffered by Corriveau by the expiration of the redemption period is outweighed by the harm to JPMorgan in being unable to utilize properties upon which it properly foreclosed after protracted litigation, and now owns. Moreover, enabling Corriveau to continue managing Greenhaven (assuming the administrator's management concludes before the redemption period expires) seems contrary to the public interest given the maintenance failures discussed above. Finally, Corriveau seems to have an adequate remedy at law.

The Court sees no reason to grant Corriveau preliminary injunctive relief against JPMorgan.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that plaintiff's Motion for Temporary Restraining Order [Docket No. 2] is **DENIED**.

DATED: November 8, 2010            ____s/ John R. Tunheim____
at Minneapolis, Minnesota.                JOHN R. TUNHEIM
                                                    United States District Judge